```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
                    HOUSTON DIVISION
```

RHONDA LOGAN,                      §
                                   §
    Plaintiff,                     §
                                   §
vs.                                §   Civil Action No. H-04-4178
                                   §
R. JAMES NICHOLSON, SECRETARY      §
OF VETERANS AFFAIRS,[1]            §
                                   §
    Defendant.                     §

## MEMORANDUM OPINION

Pending before the court[2] is Defendant's Motion for Summary Judgment (Docket Entry No. 16) and the responses filed thereto. For the reasons discussed below, the motion is **GRANTED**.

### I.  Case Background

Plaintiff, Rhonda Logan ("Logan"), filed this action against her former employer, the Veterans Administration Regional Office, Houston ("VA"), for discrimination under the Rehabilitation Act. Logan claims that she was denied an appropriate accommodation for her bipolar condition and suffered from a hostile work environment.

Plaintiff was employed by the VA and was assigned to the Loan Guarantee Unit.  Sometime during 2001, employees in the Loan

---

[1] R. James Nicholson was sworn in as Secretary of Veterans Affairs on February 1, 2005. Pursuant to Fed. R. Civ. P. 25(d), he is substituted for Anthony Principi, the original defendant.

[2] On May 6, 2005, the parties consented to proceed before the undersigned magistrate judge. See Docket Entry No. 15.

Guarantee Unit were divided into teams.[3]  Several teams were "employee-managed" teams, and at least one team was a management-directed team.  Plaintiff was assigned to an employee-managed team.  Under the latter system of management, the team discussed its performance in weekly meetings with the goal of improving team productivity.[4]  Conflicts arose within Plaintiff's team concerning workloads, work performance, perceived slights, and vacation relief duties.[5]

On March 18, 2002, Plaintiff sent an interoffice memo to Helen Galer ("Galer"), Loan Administration Officer, requesting to be excused from team meetings for an indefinite period of time.  Plaintiff explained that the meetings were too stressful and impacted her service-connected disability, and were "in turn starting to impact [her] work."[6]  Plaintiff did not disclose the nature of her service-connected disability.  Galer referred this matter to her supervisor, Raymond Biagioli ("Biagioli").

On March 20, 2002, Biagioli responded to Plaintiff's March 18, 2002, memo.  Explaining that her attendance at the team meetings

---

[3] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 2, "Notice of Right to File a Discrimination Complaint," which attached "Statement of Rhonda Logan, dated May 1, 2002."

[4] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 10, "Sworn Statement of Raymond Biagioli," pp. 20-21.

[5] Exhibits to Plaintiff's Response to Defendant's Motion for Summary Judgment, Docket Entry No. 22, "Hearing Testimony of Rhonda Logan," pp. 25-40.

[6] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 3 "March 11, 2002, memo from Plaintiff."

2

was an important part of her job duties, Biagioli denied her request to be excused from the team meetings until her request could be supported by medical documentation.[7]

Instead, on March 22, 2002, Plaintiff sent a memo to the Director of the VA, requesting a service-based disability accommodation. This request attached a letter from Dr. Penny Chow, a VA staff psychiatrist.[8] Dr. Chow did not disclose the nature of Plaintiff's disability, but generally stated that Plaintiff had a disability that had been aggravated by stress at work, specifically, by the team meetings. Dr. Chow asked that Plaintiff be relieved of her obligation to attend team meetings.[9]

On March 28, 2002, Biagioli temporarily excused Plaintiff from attending team meetings pending a final decision on her request for accommodation.[10] Plaintiff was required to read minutes of the meetings and Plaintiff's supervisor was to advise Plaintiff of any significant issues discussed at the meetings that might impact Plaintiff's case load.[11] Biagioli again informed Plaintiff that the VA needed additional information to support her request for a

---

[7] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 4 "March 20, 2002, letter to Plaintiff."

[8] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 5, "Memo to Director of VA from Plaintiff."

[9] Id.

[10] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 6 "March 28, 2002, letter to Plaintiff."

[11] Id.

3

disability-based accommodation and requested that she sign a release that would allow him to discuss her medical condition with Dr. Chow and Dr. Dayl Scherich ("Dr. Scherich"), an Employee Assistance Program counselor.[12]

On April 1, 2002, Plaintiff and Dr. Scherich met with James Hedge ("Hedge"), director of the VA's labor management relations office, to protest Biagioli's request for medical information.[13] Dr. Scherich expressed her opinion that Plaintiff had a service-connected disability and that no further information was necessary to make a decision on her request for an accommodation.[14] Hedge disagreed, stating that management needed to know the nature of the disability and what substantial limitation that disability had on a major life activity before it could discuss an accommodation.[15] According to Plaintiff, the discussion between Hedge and Dr. Scherich became loud and contentious.[16] Hedge averred that he asked for Plaintiff's cooperation in providing Biagioli with the requested information.[17] Plaintiff, believing that Hedge had

---

[12] Id.

[13] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 8, "Sworn Statement of James Hedge," p. 4.

[14] Id., p. 11.

[15] Id., p. 12.

[16] Exhibits to Plaintiff's Response to Defendant's Motion for Summary Judgment, Docket Entry No. 22, "Testimony of Rhonda Logan," p. 60.

[17] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 8, "Sworn Statement of James Hedge," p. 24.

4

implied that if she did not sign the medical release, it would affect her job, experienced a panic attack.[18]  In his sworn statement to the Equal Employment Opportunity investigator, Hedge confirmed that Plaintiff began crying during this meeting.[19]  Eventually, Dr. Scherich and Hedge agreed to a limited release of information to Biagioli.[20]  Hedge prepared the release document but Plaintiff did not sign it at that time.[21]

On April 3, 2002, Plaintiff received a letter from Biagioli again requesting medical information.[22]  He asked that she sign the enclosed release by April 10, 2002.[23]  Plaintiff took the rest of the week off.

The following week, Plaintiff requested 20.75 hours of administrative leave[24] for the time she was off work the week

---

[18]     Exhibits to Plaintiff's Response to Defendant's Motion for Summary Judgment, Docket Entry No. 22, "Testimony of Rhonda Logan," p. 61.

[19]     Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 8, "Sworn Statement of James Hedge," p. 24.

[20]     Id., p. 15.

[21]     Id.

[22]     Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 7 "April 3, 2002, letter to Plaintiff."

[23]     Id.

[24]     Administrative leave is an excused absence from work without a charge to sick or annual leave.  At a hearing held on April 5, 2006, Plaintiff's counsel explained that his client is no longer pursuing a separate claim of discrimination based on the grant of advanced sick leave instead of administrative leave.  Instead, she argues that the denial of administrative leave is evidence of a disability-based hostile work environment.

5

before.[25] Alternatively, she requested advanced sick leave and supported that request with a statement from Dr. Chow, who related that Plaintiff was experiencing stress from her job that was causing her difficulty in managing her disability.[26] Plaintiff was granted 20.75 hours of advanced sick leave.[27] Biagioli testified that he only had the authority to grant advanced sick leave, not administrative leave.[28]

Plaintiff signed the release on April 8, 2002, authorizing Drs. Chow and Scherich to discuss her medical condition with Biagioli.[29]

On April 19, 2002, Plaintiff filed an informal complaint of discrimination, alleging that she was discriminated against on the basis of her disability when her March 18, 2002, request for an accommodation was denied, when she was charged leave without pay for her absences of March 19-22, 2002, and when Hedge treated her

---

[25] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 9, "Memo from Dr. Chow," and Ex. 11, "April 11, 2002, email to Biagioli from Plaintiff and his response."

[26] Id.

[27] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 11, "April 11, 2002, email to Biagioli from Plaintiff and response."

[28] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 10, "Sworn Statement of Raymond Biagioli," p. 30; Ex. 17, "Hearing testimony of Raymond Biagioli," p. 65.

[29] According to Biagioli and Hedge, Dr. Scherich told Biagioli that Plaintiff did not want him to communicate with Dr. Chow. Acquiescing to Plaintiff's wishes, Biagioli refrained from calling Dr. Chow for information on Plaintiff's disability. Plaintiff denied telling Dr. Scherich this and insisted at the EEO hearing that she wanted Biagioli to talk to Dr. Chow. See Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 10, "Hearing Testimony of Raymond Biagioli," p. 33; Ex. 8, "Hearing Testimony of James Hedge," p. 18; Exhibits to Plaintiff's Response to Defendant's Motion for Summary Judgment, Docket Entry No. 22, "Hearing Testimony of Rhonda Logan," p. 164. It is undisputed that no medical records documenting Plaintiff's disability were ever provided to Biagioli.

as if she were not performing her job duties during the April 1, 2002, meeting.[30]

On April 24, 2002, Biagioli met with Dr. Scherich to discuss Plaintiff's request for an accommodation.[31] Although Dr. Scherich was aware of the nature of Plaintiff's disability, she did not disclose it to Biagioli.[32] Instead, Dr. Scherich told him that, because of the disability, Plaintiff experienced mood swings.[33] They discussed how best to accommodate Plaintiff's objections to attending team meetings, and agreed on a permanent accommodation.[34]

On April 30, 2002, Plaintiff received a letter from Biagioli informing her that, as a permanent accommodation, supervisors would play an expanded role in managing the agenda at the team meetings and would be present at the meetings to ensure more professional conduct by all present.[35] Plaintiff was told to return to her regularly-scheduled team meeting during the week of May 6, 2002.[36]

---

[30] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 2, "EEOC documents concerning Plaintiff's complaint of discrimination," p. 1.

[31] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 10, "Sworn Statement of Raymond Biagioli," p. 16.

[32] Id., pp. 16-18.

[33] Id.

[34] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 15, "Hearing Testimony of Raymond Biagioli," p. 62. Biagioli reported that he did not have all the information he felt he needed to make an appropriate decision on Plaintiff's requested accommodation. Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 10, "Sworn Testimony of Raymond Biagioli," p. 17.

[35] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 12, "April 30, 2002, letter to Logan."

[36] Id.

On May 6, 2002, Dr. Chow, requested that Plaintiff be excused from work for two days due to stress based on her medical disability.[37]

On May 21, 2002, Plaintiff filed a formal complaint of employment discrimination claiming that her employer failed to accommodate her disability, created a hostile work environment, and denied her administrative leave.[38]

On May 23, 2002, Dr. Chow recommended that Plaintiff be granted a medical leave of absence from May 23, 2002, through May 29, 2002, due to stress.[39] This leave was later extended through May 31, 2002. Sometime during the summer of 2002, Plaintiff was placed on medical leave for a total of sixty days.[40] In September 2002, Plaintiff was moved to another team which, according to Plaintiff, did not have hostile team meetings.[41] Nonetheless, Plaintiff found those meetings stressful.[42] She remained in the

---

[37] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 18, "Memo from Dr. Chow."

[38] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 13, "Complaint of Employment Discrimination."

[39] Defendant's Motion for Summary Judgment, Docket Entry No. 16, Ex. 19, "Memo from Dr. Chow."

[40] The record is not clear on the actual leave period, but Plaintiff testified about an encounter with a co-worker on July 1, 2002, indicating that she was working up to that date. Exhibits to Plaintiff's Response to Defendant's Motion for Summary Judgment, Docket Entry No. 22, "Testimony of Rhonda Logan," p. 171.

[41] Exhibits to Plaintiff's Response to Defendant's Motion for Summary Judgment, Docket Entry No. 22, "Testimony of Rhonda Logan," pp. 114, 154-55.

[42] Id., pp. 114-15.

8

Loan Guarantee Unit until she was granted a disability retirement in 2003.

## II.  Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, 337 F.3d 539, 540-41 (5th Cir. 2003).  The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).

If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment.  Celotex Corp., 477 U.S. at 322.  In response to a showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence which establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist which must be resolved at trial.  Id. at 324.

The nonmoving party must show more than "some metaphysical doubt as to the material facts." Meinecke v. H & R Block of Houston, 66 F.3d 77, 81 (5th Cir. 1995). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. Brown, 337 F.3d at 541; Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002).

### III.  Analysis

The Rehabilitation Act prohibits discrimination by a federal employer against qualified individuals with disabilities. The Rehabilitation Act provides, in part, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity . . . conducted by any Executive agency . . ." 29 U.S.C. § 794(a).

In order to state a claim for relief under the Rehabilitation Act, a plaintiff must prove that she: (1) was an individual with a disability; (2) was otherwise qualified; (3) worked for a federal agency; (4) was denied the benefits of her employment or subjected to discrimination solely because of his disability. Chandler v. City of Dallas, 2 F.3d 1385, 1390 (5th Cir. 1993). The Rehabilitation Act incorporates the standards used in Americans

with Disabilities Act[43] ("ADA") cases, which are subject to the Title VII burden-shifting analysis. Daigle v. Liberty Life Ins. Co., 70 F.3d 394, 396 (5th Cir. 1995); see also Daugherty v. City of El Paso, 56 F.3d 695, 697-98 (5th Cir. 1995), cert. denied, 516 U.S. 1172 (1996).

A disability, standing alone, is not necessarily a disability as contemplated by the Rehabilitation Act. A "disability" is defined as "a physical or mental impairment which substantially limits one or more major life activities." 29 U.S.C. § 705(9)(B). The term "major life activities" is not defined by the Rehabilitation Act, but Equal Employment Opportunity Commission regulations promulgated pursuant to the ADA, define the term as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).[44] A disability is not considered to "substantially limit one or more . . . major life activities" unless it affects the plaintiff's ability to engage in employment generally. Hileman v. City of Dallas, Texas, 115 F.3d 352, 353-54 (5th Cir. 1997). A physical or mental impairment that affects the claimant's ability to engage in a narrow range of jobs only or a

---

[43] The Americans with Disabilities Act is codified at 42 U.S.C. § 12101, et seq.

[44] In De la Torres v. Bolger, 781 F.2d 1134, 1136 (5th Cir. 1986), the Fifth Circuit found that the EEOC regulations found at 29 C.F.R. § 1613.702 defining "disability" and "major life activities" applied to Rehabilitation Act claims. 29 C.F.R. § 1613.702 was amended in 1996 and is now found at 29 C.F.R. § 1630.2. The definitions of "disability" and "major life activities" have remained the same.

particular job alone does not "substantially limit" one or more major life activities.  <u>Chandler</u>, 2 F.3d at 1392.

With those factors in mind, the court considers the facts in the present case.  Here, Plaintiff claims that her diagnosed bipolar disorder and post-traumatic stress disorder are mental impairments which substantially limited her "[ ]ability to function in large groups and to socialize."[45]  Plaintiff cites no Fifth Circuit case law for the proposition that functioning in large groups and/or socializing are major life activities, and the court has found none either.

This particular issue has met with mixed results in other circuits.  In <u>Soileau v. Guilford of Maine, Inc.</u>, 105 F.3d 12, 16 (1st Cir. 1997), the plaintiff claimed that his diagnosed dysthymia[46] affected his ability to get along with coworkers, most notably, his supervisor.  Soileau's employment was eventually terminated for his failure to improve his work performance and on-the-job attitude.

The First Circuit held that the "ability to get along with others" was not a major life activity under the ADA, and therefore the plaintiff was unable to make out a prima facie case of discrimination under the ADA.  In rejecting this claim, the court commented, "To impose legally enforceable duties on an employer

---

[45]   <u>See</u> Plaintiff's Response to Defendant's Motion for Summary Judgment, Docket Entry No. 21, p. 9.

[46]   Dysthymia is a chronic depressive disorder characterized by intermittent bouts of depression. <u>Soileau</u>, 105 F.3d at 14.

based on such an amorphous concept would be problematic.  It may be that a more narrowly defined concept going to essential attributes of human communication could, in a particular setting be understood to be a major life activity, but we need not address that question here."  Soileau, 105 F.3d at 16.

The Ninth Circuit took the opposite view in McAlindin v. County of San Diego, 192 F.3d 1226, 1234 (9th Cir. 1999), cert. denied, 530 U.S. 1243 (2000).  McAlindin suffered from anxiety disorders with symptoms so severe that he became "paralyzed."  After receiving a provisional promotion, McAlindin found that the stresses of the new position caused him to become agitated and verbally abusive when a supervisor ignored his complaints about a vendor's misconduct.  He took several medical leaves of absence to address his stress symptoms but was ordered back to work after an employer-retained psychiatrist opined that McAlindin could return to work after a short period of psychotherapy and new medication.  McAlindin sued for discrimination and retaliation under the ADA.

The district court granted summary judgment on plaintiff's disability claims, finding that he lacked a "disability" within the meaning of the ADA.  The Ninth Circuit reversed, and found that "interacting with others" is "an essential, regular function, like walking and breathing" that "easily falls within the definition of 'major life activity'" under the ADA.  McAlindin, 192 F.3d at 1234.

13

The McAlindin court rejected any notion that "interacting with others" was too vague to make the term unworkable and held that a substantial limitation in "interacting with others," was present when a plaintiff demonstrated high levels of hostility, social withdrawal or failures to communicate.  The court cautioned that mere "trouble getting along with coworkers," or being cantankerous, was not sufficient to show a substantial limitation under the ADA.

In Jacques v. DiMarzio, Inc., 386 F.3d 192 (2nd Cir. 2004), the Second Circuit steered a middle course, finding that "interacting with others" was a major life activity, but it was only "substantially limited" for purposes of the ADA when "the mental or physical impairment severely limits the fundamental ability to communicate with others."  The Second Circuit explained that this standard would be satisfied if a plaintiff were severely limited in her ability to initiate contact with other people and respond to them at a most basic level.  The standard would not be met by a plaintiff whose ability to communicate was not substantially limited but whose communication was inappropriate, ineffective, or unsuccessful.  Jacques, 386 F.3d at 203.

While the Jacques court characterized the major life activity as "interacting with others," this court views the Jacques court as merely amplifying the major life activity of speaking to include substantial limitations in expressive speech which impact a

14

person's basic ability to communicate, but excluding more controllable behavioral or personality-based components of speech.

In light of the case law discussed above, the court rejects Plaintiff's premise that "functioning in a large group and/or socializing" is a major life activity, but instead considers whether Plaintiff has shown that she is "substantially limited" in her ability to interact or initiate communication with others at a very basic level.

The evidence in the record indicates no such profound inability to communicate with others.  Instead, the record indicates that Plaintiff's mental impairment caused her to experience stress in staff meetings which were characterized by disagreements and raised voices.  Plaintiff does not argue, and cannot argue given the facts in the record, that she is substantially limited in her ability to interact or communicate with others on a very basic level.

The court cannot subscribe to the view that Plaintiff's professed mood swings and stress-related symptoms experienced in contentious staff meetings are significant limitations to any major life activity recognized by the Rehabilitation Act.  Quite simply, Plaintiff's impairments, while significant, do not meet the definition of a disability under the Rehabilitation Act.

As the court finds that Plaintiff does not meet the definition of being a qualified individual with a disability, the court need

not reach the issue of whether Defendant discriminated against her by not implementing the accommodation requested by Plaintiff.

Likewise, as Plaintiff has not established coverage under the Rehabilitation Act, the court need not address her complaint that she was subjected to a disability-based hostile work environment.

### IV.  Conclusion

Based on the foregoing, Defendant's Motion for Summary Judgment is **GRANTED** in all respects.

SIGNED in Houston, Texas, this 30th day of May, 2006.

Nancy K. Johnson
United States Magistrate Judge